UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NANCY EDWARDS,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 1:08-cv-374

HONORABLE PAUL L. MALONEY

Magistrate Judge Joseph G. Scoville

**OPINION and ORDER**

**Overruling the Plaintiff's Objections and Adopting the R&R;
Declining Sentence-Six Remand for Consideration of Untimely Evidence;
Affirming the Commissioner's Denial of Disability Benefits;
Terminating and Closing the Case**

Pursuant to 28 U.S.C. § 636 and W.D. MICH. LCIVR 72.2(b), this matter was automatically referred to the Honorable Ellen S. Carmody, United States Magistrate Judge, who issued a Report and Recommendation ("R&R") on July 30, 2009 [document #14]. Plaintiff filed timely objections on August 3, 2009 [document #15]. The court also finds that plaintiff's objections are sufficiently specific and articulated to trigger *de novo* review of the portions of the R&R to which she has objected.[1] As ordered by the court, the Commissioner timely filed a response to the objections on

---

[1] "'Only those objections that are specific are entitled to a *de novo* review under the statute.'" *Westbrook v. O'Brien*, 2007 WL 3462337, *1 (W.D. Mich. Nov. 15, 2007) (Maloney, J.) (citing *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (no *de novo* review where the objections are frivolous, conclusory or too general because the burden is on the parties to "pinpoint those portions

August 25, 2009 [document #18]. Edwards did not file a reply brief within the time allotted by the Rules, nor did she seek an extension of time in which to do so.[2]

**The court finds the R&R to be well-reasoned and is unconvinced by the plaintiff's objections.** For the reasons explained by the R&R, substantial evidence supported the ALJ's October 2007 determination that Edwards' impairments – bipolar disorder, anxiety, and carpal tunnel syndrome – did not render her disabled between her alleged onset date (August 27, 2004) and her date last insured ("DLI").

The Magistrate Judge noted that when Edwards checked herself into a hospital on August 30, 2004, she was suffering from depression, insomnia, low energy, poor concentration, social withdrawal, suicidal thoughts, anxiety and panic; had been drinking for years, including about a bottle and a half of champagne daily at the current time; was using Ambien to fall asleep, which caused "hangovers" in the morning; and was experiencing money problems and job stress; was having difficulty recovering from a rape 22 years earlier and from her husband's death 15 years

---

of the Magistrate's report that the district court must specifically consider")).

[2]

The Federal Rules of Civil Procedure do not address whether a party objecting to an R&R has a right to file a reply brief in support of his objections. *See* FED. R. CIV. P. 72(b)(2) (stating only, in pertinent part, "A party may respond to another party's objections within 10 days after being served with a copy."). Our local rule governing "Review and appeal of Magistrate Judges' decisions" does not address this issue either. *See* W.D. MICH. LCIVR 72.3. Therefore, neither set of rules specifies the deadline for such a reply where it is permitted.

Out of an abundance of caution, the court accorded Edwards the amount of time which is allowed for a reply brief in support of a dispositive motion, 14 days. *See* W.D. MICH. LCIVR 7.2(c).

Edward's fourteen-day reply period began on Wednesday, August 26, the day after the Commissioner e-filed its response, *see* FED. R. CIV. P. 6(a)(1), and the court counted all days, including weekends and holidays, *see* FED. R. CIV. P. 6(a)(2). Accordingly, Edwards' reply period expired at midnight on Tuesday, September 8, 2009, *see* FED. R. CIV. P. 6(a)(3).

2

earlier; and had a GAF score[3] of only 18 (on a scale of zero to 100), which indicated that she was in "some danger of hurting [her]self or others or occasionally fail[ing] to maintain minimal personal hygiene or [experiencing] gross impairment in communication." *See* R&R at 4 (citing Transcript at 164-68 and DSM-IV at 34). Edwards was diagnosed with recurrent, severe, major depressive disorder without psychotic features (in substantial remission) and a suicidal tendency (also in remission), leading her to participate in therapy, but not psychological testing because such testing was not indicated. *See* R&R at 4 (citing Tr. at 156-58).

When Edwards was discharged from the hospital six days later, on September 4, 2004, her

---

[3]

The Global Assessment of Functioning score is a clinician's assessment of the individual's overall level of functioning. *See Smith v. Astrue*, – F. Supp.2d –, – n.11, 2009 WL 1992538, *11 n.1 (W.D. Mich. July 7, 2009) (Maloney, C.J.) (citing American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) ("DSM-IV")). It is a necessarily subjective assessment and is often determined by someone other than a medical doctor.

A GAF score itself is not a medical opinion. *See Nottingham v. SSA*, 2009 WL 230131, *9 (W.D. Mich. Jan. 29, 2009); *see also Pethers v. SSA*, 580 F. Supp.2d 572, 579 (W.D. Mich. 2008) (citing 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) (defining "medical opinions")). While the ALJ and the court generally defer to adequately-supported medical opinions expressed by a claimant's care providers, they are not required "to put stock" in a GAF score in the first place' because it does not constitute "raw medical data." *Kornecky v. SSA*, 167 F. App'x 496, 503 n.7, 511 (6th Cir. 2006) (Richard Allen Griffin, J.) (citing *Howard v. SSA*, 276 F.3d 235, 241 (6th Cir. 2002)). Significantly, the SSA has refused to endorse the use of the GAF scale for use in the Social Security and SSI disability programs, cautioning that the scale "does not have a direct correlation to the severity requirements in our mental disorder listings." *DeBoard v. SSA*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting REV. MED. CRITERIA FOR EVALUATING MENTAL DISORDERS AND TRAUMATIC BRAIN INJURY, 2000 WL 1173632, 65 FED. REG. 50476, 50764-65 (Aug. 21, 2000)).

*See, e.g., Dailey v. SSA*, 2009 WL 2568280, *12 (W.D. Mich. Aug., 18, 2009) ("Plaintiff faults the ALJ for failing to accord significance to the . . . determination by a non-treating physician that plaintiff's then current GAF score was 50. * * * The medical record does not support Plaintiff's argument that his non-exertional impairments limit him to an extent beyond that recognized by the ALJ's RFC determination, which is supported by substantial evidence. The Court, therefore, discerns no error.") (citing *Kornecky*).

3

GAF had markedly improved to 70 – which indicates that she had only "some mild symptoms or some difficulty in social, occupational, or school functioning, but [was] generally functioning pretty well [and had] some meaningful interpersonal relationships"; her prognosis was "good" with treatment, "fair" without treatment, and "poor" if she continued to use drugs and alcohol; and she was cleared to work without restrictions. *See* R&R at 4-5 (citing Tr. at 155 and 157-58 and DSM-IV at 34). According to treatment notes, Edwards was no longer taking anti-depressant medication by December 7, 2004, but a March 2005 consultative examination by Neil Reilly, M.A., showed her reporting "pretty constant" depression; manic episodes lasting two to three days; a failure or refusal to shower, dress, or get out of bed for as long as eight days recently; a history of addiction to prescription medications; and anxiety at family gatherings. *See* R&R at 5 (citing Tr. at 170 and 192). Edwards reported that her medications "helped some", but admitted that she continued to drink alcohol "a couple times a week", drinking "four glasses of wine at a time", and stated that her depression worsened as she drank more. *See* R&R at 5 (citing Tr. at 192 and 193). As for daily activities, Edwards reported reading a lot, spending "a lot of time" on the Internet, cooking, washing dishes, shopping, and doing laundry. *See* R&R at 5 (citing Tr 194 and 195-96). Although Edwards appeared anxious and was assigned a GAF diminished to 58,[4] examination showed a normal mental status; she was diagnosed with moderate to severe bipolar disorder[5], generalized anxiety[6] with some

---

[4]

To the extent that an ALJ accords weight to the GAF score, "[a] GAF score of 58 indicates 'moderate symptoms or moderate difficulty in social, occupational, or school functioning.'" *Bieschke v. SSA*, 2009 WL 735077, *12 n.1 (W.D. Mich. Mar. 12, 2009) (quoting DSM-IV at 34).

[5]

"Bipolar disorder is a mood disorder characterized by the occurrence of both manic and depressive episodes." *Butler v. Apfel*, No. 97-36004, 189 F.3d 472, 1999 WL 595335, *2 n.8 (9th Cir. Aug. 9, 1999) (citing STEDMAN'S MEDICAL DICTIONARY 460, 508 and 1061 (26th ed. 1995)); *see also In re Zyprexa Prods. Liab. Lit.*, 253 F.R.D. 69, 98 (E.D.N.Y. 2008) ("Bipolar disorder is

4

post-traumatic features, and alcohol dependence.

The following month, April 2005, a Dr. Overbey completed a Psychiatric Review Technique form finding that Edwards was dependent on alcohol and suffered a mood disturbance which satisfied the Part A criterion for the Section 12.04 "Affective Disorder" Listing of Impairments, but not any of the Part B criteria. Dr. Overbey found that Edwards was moderately restricted in daily living activities; social functioning; maintaining concentration, persistence or pace; and had experienced one or two episodes of decompensation. *See* R&R at 6 (citing Tr. at 207-223). "As our

---

a serious lifelong mental illness marked by dramatic shifts in mood, from abnormally elevated, expansive, or irritable mood to states of extreme sadness and hopelessness, often with periods of normal mood in between.") (citing National Institutes of Health - National Institute of Mental Health, http://www.nimh.nih.gov/health/publications/bipolar.cfm).

[6]

"One authoritative source sets out six criteria for diagnosing GAD:

'The essential feature of Generalized Anxiety Disorder is excessive anxiety and worry (apprehensive expectation), occurring more days than not for a period of at least 6 months, about a number of events or activities. (Criterion A). The individual finds it difficult to control the worry. (Criterion B). The anxiety and worry are accompanied by at least three additional symptoms from a list that includes restlessness, being easily fatigued, difficulty concentrating, irritability, muscle tension, and disturbed sleep . . . . (Criterion C).

The focus of the anxiety and worry is not confined to features of another Axis I disorder such as . . . Panic Disorder . . . Social Phobia . . . Obsessive-Compulsive Disorder . . . and the anxiety and worry do not occur exclusively during Posttraumatic Stress Disorder (Criterion D). Although individuals with [GAD] may not always identify the worries as "excessive", they report subjective distress due to constant worry, have difficulty controlling the worry, or experience related impairment in social, occupational, or other important areas of functioning (Criterion E). The disturbance is not due to the direct physiological effects of a substance (i.e., a drug of abuse, a medication, or toxin exposure) or a general medical condition and it does not occur exclusively during a Mood Disorder, a Psychotic Disorder, or a Pervasive Developmental Disorder (Criterion F).'"

*Kornecky*, 167 F. App'x at 502 n.4 (quoting DSM-IV-TR at 472-73) (¶ break added).

Circuit has explained, 'Decompensation is the appearance or exacerbation of a mental disorder due to failure of defense mechanisms.'" *Bailey v. SSA*, 623 F. Supp.2d 889, 895 n.16 (W.D. Mich. 2009) (Maloney, C.J.) (quoting *Kornecky*, 167 F. App'x at 499 n.3) (quoting STEDMAN'S MED. DICTIONARY 462 (27th ed. 2000))); *see also Lee v. Astrue*, 2009 WL 693156, *12 n.24 (M.D. Tenn. Mar. 13, 2009) ("Decompensation is the 'failure of defense mechanisms resulting in progressive personality disintegration.'") (quoting DORLAND'S ILLUS. MED. DICTIONARY 437 (27th ed. 1988)).[7] Significantly, Dr. Overbey's written Mental RFC assessment found that Edwards was moderately limited in four areas (understanding and memory, sustained concentration and persistence, social interaction, and adaptation) but either "not significantly limited" or not limited at all in the other *sixteen* categories. *See* R&R at 6 (citing Tr. at 221-223).

In September 2005, five months after Overbey's examination, Edwards said she was going to try to find a part-time job but was "finding it hard not to drink." Over one year later, in

---

[7]
>
> The regulations provide that episodes of decompensation are
>
> "exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in . . . maintaining concentration, persistence or pace." 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00(C)(4).
>
> The Railroad Retirement Act regulations provide a useful explanation of how decompensation manifests itself in the work setting. In the workplace, decompensation manifests itself as 'a repeated failure to adapt to stressful circumstances which cause the individual either to withdraw from that situation or to experience exacerbation of signs or symptoms . . . with an accompanying difficulty in maintaining . . . concentration, persistence or pace (i.e., deterioration which may include deterioration of adaptive behaviors). Stresses common to the work environment include decisions, attendance, schedules, completing tasks, interaction with supervisors, interactions with peers, etc." 20 C.F.R., pt. 220, app. 1, § 12.00(C)(4)."
>
> *Kornecky*, 167 F. App'x at 499 (paragraph break added).

September 2006, treatment notes indicate Edwards was still drinking a full bottle of wine around noon every day. *See* R&R at 6 (citing Tr. at 227 & 229). Three months later, in December 2006, Edwards again reported that she was drinking "a fifth" of wine, which equates to a full bottle, every day.[8] At that time, consulting physician Dr. Jack Carr examined Edwards at her attorney's office, noted an affect fluctuating between euphoric and tearful, assigned a GAF score of 45, and diagnosed her with alcohol dependence and bipolar II disorder - depressed. *See* R&R at 6-7 (citing Tr. at 231 and 237). Edwards told Dr. Carr that a job would be "helpful", but he noted that it was "not clear" whether she had made any "significant effort" to find work. *See* R&R at 7 (citing Tr. at 237-4240). Five months later, treatment notes stated that Edwards continued to drink a full bottle of alcohol every day and had not taken "any steps to curb her drinking." *See* R&R at 7 (citing Tr. at 246). Finally, in June 2007, Edwards' treating psychiatrist characterized her prognosis as "poor", opining that her functioning was "marginal" *due to* depression, social withdrawal, avolition[9], and her abuse of alcohol. *See* R&R at 7 (citing Tr. at 245).

Since January 1, 1997, federal statute has effectively required the SSA to determine disability without considering the effects of substance abuse and addiction, and the statute draws no distinction between alcohol and other drugs, nor between legal and illegal drugs. *See* Pub. L. No. 104-121, 110 Stat. 847 (1996). "[T]he social security administration must deny a claim for benefits if drug addiction or alcohol is a contributing factor material [to] a finding of disability." *Siemon v. SSA*, 72

---

[8]"A fifth" is a colloquial term for a fifth of a gallon, which equals 25.368 fluid ounces (in the metric system, 750 mL).

[9]

Avolition is a lack of initiative or motivation, *see Constable v. Peake*, 2008 WL 4694608, *5 n.5 (Vet. App. Sept. 30, 2008) (citing http://bipolar.about.com/od/glossary/g/gl_avolition.htm retrieved Sept. 15, 2008), and it is observed in schizophrenia, *see Boothe v. Quarterman*, 2008 WL 1771919, *10 n.7 (S.D. Tex. Apr. 15, 2008), *judgment aff'd*, 356 F. App'x 257 (5th Cir. 2009).

F. App'x 421, 422 (6th Cir. 2003) (p.c.) (Keith, Cole, Cook) (citing 42 U.S.C. §§ 423(d)(2)(C) and 20 C.F.R. § 404.1535). *See, e.g., id.* (affirming ALJ's determination that claimant was not rendered disabled by his chronic hepatitis B, dysthymia, anxiety, personality disorder, and history of alcohol dependency); *Ellison v. SSA*, 101 F. App'x 994, 995 (6th Cir. 2005) (p.c.) (Siler, Cole, Rogers) (affirming ALJ's determination that under new statutory standard, claimant's severe impairments of degenerative disc disease, dysthymia, and alcoholic neuropathy left him able to perform a significant range of light work); *Hopkins v. SSA*, 96 F. App'x 393, 395 (6th Cir. 2004) (p.c.) (Kennedy, Martin, Rogers) ("Because Hopkins' original award of benefits was based on his drug addiction and alcoholism, the Commissioner was required by law to terminate Hopkins' benefits. The law requires that the Commissioner make a new medical determination on whether Hopkins was disabled without considering his drug addiction and alcoholism.") (citing 42 U.S.C. §§ 423(d)(2)(C) and 1382(a)(3)(J)).

The ALJ applied the correct legal standards, and determined that Edwards' substance abuse disorder, bipolar disorder, anxiety disorder and borderline personality disorder rendered her disabled, but that her acknowledged substance abuse was material to the ultimate determination whether she was disabled. He went on to find that if Edwards discontinued her substance abuse, she would retain the capacity to perform work that did not require her to maintain concentration and attention to perform detailed or complex tasks. Those limitations prevented her from performing her past relevant work, but did not prevent her from performing about 50,000 jobs in the State of Michigan (a number based on the testimony of a vocational expert), so the ALJ properly found her not disabled. *See* R&R at 9 (citing Tr. at 17-25 and 465-69).

As the Magistrate correctly noted, the record evidence identified only one period of time

during which Edwards abstained from alcohol – her hospitalization from August 30 through September 4, 2004. Uncontested evidence in the record shows that during that very brief period of sobriety[10], Edwards's GAF score increased markedly, from 18 to 70, and she was cleared for gainful employment. Significantly, hospital personnel opined on discharge that her prognosis was "good" with treatment and "fair" without treatment; it was "poor" only if she resumed the use of drugs and abuse of alcohol.

Edwards attacks the Magistrate Judge for "failing" to produce evidence that drinking at least one full bottle of wine every day for a period of thousands of days, almost without interruption (and sometimes in temporal proximity to use of prescription and nonprescription drugs such as Ambien), affected her ability to work. *See* P's Objections at 9-11. Edwards herself presents no medical opinion to gainsay this eminently logical premise, either as a general proposition or with regard to her particular physical and mental state and their likely causes. Edwards merely theorizes, with no citation to medical evidence or opinion, that such prolonged daily alcohol abuse would affect her ability to work only in the afternoon and evening after she drank, not in the mornings. Specifically,

---

[10]

Edwards seems to imply that she obtained access to alcohol while in the hospital and drank it without being apprehended and reported by hospital personnel. In her objections, she implicitly questions the premise that she did not drink while under supervision in the hospital:

> Note that the magistrate's theory rests on four inferences: 1. That plaintiff did not drink in the hospital; 2. That such nondrinking was responsible for the increase in her GAF; 3. That, if nondrinking increases GAF, then drinking must depress it; 4. That a depressed GAF mans increased impairment and that, based on these inferences, Plaintiff's drinking impaired Plaintiff. While some of these inferences are of varying validity. . . .

The court notes that Edwards' counsel is careful never to actually state that Edwards drank alcohol while in the hospital, let alone submit an affidavit from Edwards so stating. Counsel's tactic in this regard is unavailing at best, disingenuous at worst.

9

Edwards asserts that such fairly-copious amounts of alcohol would be fully metabolized by the morning, but she cites no medical data to back this up. Nor does she cite any medical evidence or opinion to support her preferred notion that from the minute alcohol has been "metabolized" – a term she does not define or explain – the drinker will suffer no further adverse effects, presumably being able to work as much and as well as any otherwise-similarly-situated person who did not drink. Such a counterintuitive notion is belied by her own statement that one of her biggest problems when she did work was the difficulty she experienced simply getting up *in the morning*. *See* Tr. at 440.

Moreover, it is significant that during the alleged disability period, Edwards's own treating source wrote that Edwards reported being unable and/or unwilling ("finding it difficult") to stop drinking so heavily (at least one full bottle of wine at or after mid-day). The treatment notes mention this directly in connection with her inability and/or failure to secure even part-time work. *See* September 2005 treatment notes at Tr. 227 & 229; *cf. Bartley v. Barnhart*, 117 F. App'x 993, 994, 995 (6th Cir. 2004) (Guy, Sutton, N.D. Ohio D.J. James Carr) (affirming denial of disability benefits to claimant who had hypertension and lung problems associated with his drug and alcohol abuse, and who had explained his inability to keep a job by stating, "Felony conviction, drug related charge, not being physically able to do work, would get a job if found one, though. I can hold a job when I am straight. I just can't stay straight.").

**Edwards submitted evidence to the Appeals Council which she had not submitted to the ALJ.** Namely, Edwards proffers sworn statements from Dr. Curt Cunningham and Dr. Kenneth Nelson which she did not obtain until after the ALJ's decision. The Appeals Council considered the new evidence but declined to review the ALJ's decision. As the Magistrate correctly noted, *see*

R&R at 11 (citing, *inter alia*, *Cline v. SSA*, 96 F.3d 146, 148 (6th Cir. 1996)), under these circumstances a federal court lacks authority to consider such post-ALJ evidence when reviewing the ALJ's decision. *See also Elliott v. Apfel*, 28 F. App'x 420, 423 (6th Cir. 2002) (Ryan, Batchelder, N.D. Ohio D.J. Paul Matia) (citing *Cline*, 96 F.3d at 148, and *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993)); *Osburn v. Apfel*, No. 98-1784, 1999 WL 503528, *4 (6th Cir. July 9, 1999) (Cole, Clay, Jones); *Wyatt v. HHS*, No. 92-2331, 12 F.3d 216, 1993 WL 492311, *3 and n.2 (6th Cir. Nov. 29, 1993) (p.c.) (Jones, Siler, Lively) ("We must therefore treat the post-hearing evidence submitted to the Appeals Council no differently than evidence submitted for the first time to us.").

As the Magistrate also correctly noted, *see* R&R at 11, while the court may not itself consider such new evidence, it is authorized, under limited circumstances, to vacate the ALJ's decision and remand for him to consider the evidence which was submitted for the first time before the Appeals Council. To justify such a remand under "sentence six" of 42 U.S.C. § 405(g), however, Edwards must show that she had good cause for failing to introduce the evidence before the ALJ, and that the new evidence is "material." *See Jeffries v. SSA*, 23 F. App'x 351, 352-53 (6th Cir. 2001) (p.c.) (C.J. Martin, Daughtrey, Moore) (citing *Cline*, 96 F.3d at 149). Edwards did not make those showings before the Magistrate Judge, and her objections still do not make those showings.

**Edwards does not even make a good-faith effort to show that she had good cause for failing to introduce Dr. Cunningham's opinion before the ALJ.** Rather, she makes the following absurd assertion, "As of the hearing, Dr. Cunningham had not rendered any opinion as to whether Plaintiff would be disabled apart from alcohol use. The evidence therefore did not exist at the time of trial." P's Objections at 14. This begs the question, "What good cause did Edwards have for

11

failing to *request and obtain* said opinion from Dr. Cunningham, a treating physician, <u>before</u> the ALJ hearing?" Under Edwards' reasoning, a disability claimant can neglect to timely obtain a relevant medical opinion or data; wait to see if the ALJ rules in her favor; and then, if he does not, she can belatedly obtain additional favorable medical opinion or data, and the reviewing federal court will be obliged to find that "the new evidence did not exist" at the time of the ALJ hearing. This is not the law in our circuit, and Edwards cites no case law to suggest otherwise.

Edwards makes no attempt to explain why she could not have obtained Cunningham's opinion before the ALJ hearing – or at least before the ALJ's *decision* – through the exercise of due diligence. *Cf. Ramos v. SSA*, 2007 WL 6139972, *2 (W.D. Mich. Nov. 26, 2007) (Paul L. Maloney, J.) ("Ramos . . . contends . . . that due to the loss of his job in early 2003, he lacked the financial resources to commission the examinations by psychiatrist Salva and psychologist Mulder before the ALJ's October 2005 decision. Yet Ramos failed to present the Magistrate Judge with any affidavit or other evidence to substantiate this claim of indigency. * * * It is Ramos' burden to . . . [provide] proof that he could not obtain the new evidence earlier through reasonable diligence."). Edwards has not alleged, for example, that her counsel tried diligently to commission and obtain these medical opinions some reasonable time before the ALJ hearing but was thwarted by dilatoriness by the treators or their staff. *Contrast Bullock v. SSA*, 2008 WL 5235852, *4 (E.D. Mich. Dec. 12, 2008) (George Caram Steeh, J.) ("Bullock and his counsel demonstrated 'good cause' for not presenting these materials to the Commissioner in that the medical records were not provided to Bullock before the Appeals Council denied review . . . , *notwithstanding Counsel's exercise of due diligence*.") (citing *Faucher v. HHS*, 17 F.3d 171, 174 (6th Cir. 1994) and *Sizemore v. HHS*, 865 F.2d 709, 711 n. (6th Cir. 1988)); *Shaft v. Apfel*, 100 F. Supp.2d 454, 459 (E.D. Mich. 1999) (Roberts, J.)

12

("Plaintiff has demonstrated good cause for failing to obtain this evidence prior to the hearing. Counsel diligently sought these records several weeks prior to the hearing, but did not receive them until several months later.").

**In any event, even assuming *arguendo* that Edwards had good cause for failing to obtain and present the new Cunningham and Nelson opinions before the ALJ, Edwards has not shown that the evidence is material.** For this purpose, new evidence is not material unless there is a "reasonable probability" that the ALJ would have reached a different disposition of the claim if he had been presented with the new evidence. *See Hollon v. SSA*, 447 F.3d 477, 484 (6th Cir. 2007) (citing *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). This court agrees with the Magistrate: Edwards has not shown a reasonable probability that the new Cunningham and/or Nelson opinions would have led the ALJ to decide the disability claim differently, whether taken singly or together.

Edwards emphasizes that both Cunningham and Nelson opined that alcohol intake was a "secondary issue" compared to her mental state and sources of stress. She also emphasizes Cunningham's opinion that her GAF score would be no more than 50 even if she were not drinking alcohol. *See* P's Objections at 13. Edwards' argument on this issue fails in every respect.

First, Edwards does not identify any solid basis for Cunningham's assertion that *if* she were not drinking, her GAF would still be 50 or lower. Specifically, Edwards does not allege that Cunningham had ever examined her – either during the alleged insured disability period, or at least shortly before or after that period – *when she was not drinking*. Nor does Edwards allege that Cunningham was relying on notes written by another physician who had examined her during the relevant period when she was not drinking. Consequently, Edwards provides no basis for the court

13

to treat Cunningham's assertion on that issue as more than speculation, let alone inherently and automatically entitled to greater weight than other evidence in the record. This defeats Edwards' assertion that if she had presented Cunningham's opinion to the ALJ, the ALJ legally would "have to" accept it. *See* P's Objections at 14-15 and n.1.

Moreover, neither the decision cited by Edwards – *Howard v. SSA*, 276 F.3d 235, 240 (6th Cir. 2002) – nor any other statute, regulation, or Sixth Circuit precedent of which the court is aware, holds that an ALJ must give controlling weight to a treating physician's speculation when it does not appear to be supported by any objective medical evidence, such as laboratory test results or examinations in the relevant condition (in this case, when she was not drinking) and during or close to the relevant period. "*[T]he ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion,* or is contradicted by substantial medical evidence." *Hengesbach v. SSA*, 2009 WL 1230414, *8 (W.D. Mich. Apr. 30, 2009) (emphasis added) (citing, *inter alia*, *Cohen v. HHS*, 964 F.2d 524, 528 (6th Cir. 1992) and *Cutlip v. HHS*, 25 F.3d 284, 286-87 (6th Cir. 1994)) (treating physician's opinion rested on plaintiff's subjective allegations of pain and limitation, and those allegations in turn were inconsistent with his self-reported daily activities). *See, e.g., Love v. SSA*, 605 F. Supp.2d 893, 906 (W.D. Mich. 2009) (substantial evidence supported ALJ's decision to accord less than controlling weight to treating physician's opinion; physician gave claimant postural limitations in areas where there was no evidence that she had tested his abilities, and her opinion that claimant experienced severe limitations was contradicted by the results of numerous physical examinations and claimant's own reports that his pain was sufficiently managed by medication).

Furthermore, Edwards asserts that a GAF of 50 – which Cunningham speculated she would

have even without drinking – establishes disability as a matter of law. But she cites no precedential decisions for such an extreme proposition, and the court finds none. *See* P's Objections at 15 (citing only *Trudell v. Apfel*, 130 F. Supp.2d 891, 897 (E.D. Mich. 2001) and *Doud v. SSA*, 314 F. Supp.2d 671 (E.D. Mich. 2003)). As the court noted above, ALJs and courts are not legally obligated to attach *any* weight to a GAF score as a general rule. The SSA has emphatically declared – without being "overruled" by Congress – that GAF scores do not correspond directly to the legal standard for disability in the first place. *Accord Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005).

Consistent with the agency's policy on this score, this court and others have recognized that while GAF scores may sometimes be useful, they may also be of little or no probative value. *See, e.g., Edwards v. Astrue*, 2009 WL 976473, *7 (W.D. Ky. Apr. 10, 2009) (Edward Johnstone, Sr. J.) (ALJ did not err in finding that mental impairment was non-severe, notwithstanding GAF score of 55, where that determination was consistent with opinion of two state-agency psychologists); *Ackermann-Papp v. SSA*, 2008 WL 314682, *2-3 (W.D. Mich. Feb. 4, 2008) (Paul L. Maloney, J.) ("The Magistrate Judge correctly rejected Ackermann-Papp's sole appellate argument, that the ALJ did not properly consider the opinion of a treating psychologist and a consulting psychologist. [N]o treating source actually rendered a medical opinion – properly understood – about Ackermann-Papp's ability to perform basic work activities during the relevant period, as a Global Assessment of Functioning ('GAF') score alone does not constitute a medical opinion.") (citing 20 C.F.R. § 404.1527(a)(2) and § 416.927(a)(2) for definition of "medical opinion"); *Oates v. Astrue*, 2009 WL 1154133, *7 (S.D. Ala. Apr. 27, 2009) (Callie Granade, C.J.) ("[T]he ALJ in this case did not err in finding more relevant the findings of the medical and non-medical evidence of record in

determining the claimant's residual functional capacity, rather than GAF scores . . . .").[11]

Thus, even if the ALJ had been given Cunningham's opinion and had accorded controlling weight to Cunningham's assertion that Edwards would have a GAF of 50 or less without drinking, that would not make it "reasonably probable" that the ALJ would have granted her claim in light of the entire record.

**Finally, Edwards conveniently neglects to mention statements by Drs. Cunningham and Nelson which are inconsistent with her attempt to portray their opinions as unequivocal statements that she would be disabled even if she stopped abusing alcohol, or that her alcohol abuse was not material to the disability determination.** As the Magistrate noted, Dr. Cunningham stated only that Edwards' alcohol abuse was "probably" secondary to her impairment from emotional problems, *see* R&R at 12 (citing Tr. at 393-96). More significantly, Dr. Nelson conceded that Edwards' "history of daily alcohol consumption has to be considered as contributing to" her emotional problems. *See* Tr. at 393. Thus, even if the ALJ had considered and credited Nelson's opinion, its tendency to support Edwards' case would have been muddled, and undermined, by this last statement.

---

[11]

Moreover, "[w]hile a GAF score says something in a very general way about ability to perform basic work activities, the specific score assigned may relate more particularly to social or school functioning rather than occupational functioning." *Bronson v. Astrue*, 530 F. Supp.2d 1172, 1185 (D. Kan. 2008). Without a cogent, sufficiently detailed accompanying narrative from the source assigning the GAF, in this case a treating source, GAF score's bearing on the claimant's ability to work is limited or unclear.

Finally, a GAF score may be considered unreliable to the extent that it is based on a claimant's own unreliable reports of her own symptoms, mental state, and limitations. *See Ramey v. Astrue*, 2009 WL 537200, *5 and n. 4 (E.D. Tenn. Mar. 3, 2009) (Leon Jordan, J.) ("[T]o the extent that plaintiff seeks to rely on various mid-range to low GAF scores found in the record, those scores have no bearing on the court's analysis in light of plaintiff's grossly unreliable self-reporting.") (citing *DeBoard*, 211 F. App'x at 415-16).

**In short, Edwards' objections, including her proposed new evidence, do nothing to undermine the Magistrate's conclusions that substantial evidence supported the determination that she would not be disabled but for her abuse of alcohol, and that she did not carry her burden of showing entitlement to sentence six remand.** *See Rice v. SSA*, 169 F. App'x 452, 454 (6th Cir. 2006) (Siler, Batchelder, Moore) ("We agree with ALJ Antrobus's conclusion that the medical evidence in the record reflects that Rice's disability is caused or exacerbated by chronic substance abuse and addiction, and that if Rice were to achieve sobriety, he would not be precluded from light work."); *Zarlengo v. Barnhart*, 96 F. App'x 987, 989 (6th Cir. 2004) (p.c.) (Guy, Gilman, Cook) (substantial evidence supported determination that when claimant was not abusing alcohol, she retained the capacity to perform her past relevant work as a "deli slicer", consistent with her restriction to light-exertional work involving simple, routine tasks and low productivity); *Nottingham v. SSA*, 2009 WL 230131, *9 (W.D. Mich. Jan. 29, 2009) (notwithstanding GAF scores of 36, 40, 50 and 52 during the insured period, court affirmed rejection of disability claim by a woman who suffered from severe impairments of right ankle fracture with deformity, depression with schizoaffective disorder presentation, personality disorder, and a history of alcohol abuse, noting, "The medical evidence . . . reveals that when Plaintiff takes her medication as directed *and does not abuse alcohol*, she functions at a level consistent with the ALJ's RFC determination.").[12]

---

[12] *Cf. Bailey v. SSA*, 623 F. Supp.2d 889, 899 (W.D. Mich. 2009) (affirming rejection of disability claim where, *inter alia*, the claimant "unjustifiably failed or refused to follow the treatment and *healthy conduct* prescribed. [S]he expressly refused her doctor's advice to stop smoking marijuana. Bailey did not give, and has not given, legitimate reasons for this lack of cooperation and effort towards compliance . . . .") (citing 20 C.F.R. § 404.1530(c), "Acceptable reasons for failure to follow prescribed treatment").

13

**ORDER**

Accordingly, having reviewed the complaint, the R&R, the plaintiff's objections to the R&R, the defendant's response to the objections, and the applicable law:

The plaintiff's objections [document # 15] are **OVERRULED**.

The Report & Recommendation [document # 14] is **ADOPTED**.

The complaint is **DISMISSED**.

The Commissioner's denial of disability benefits is **AFFIRMED**.

A separate judgment will issue as required by FED. R. CIV. P. 58.

This case is **TERMINATED** and **CLOSED**.

This is a final order. Plaintiff may appeal only with regard to those portions of the R&R to which she filed a timely, specific objection.

**IT IS SO ORDERED** this ___10th___ day of September 2009.

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

13
As the SSA points out in its response to Edwards' objections, she never expressly requested a sentence-six remand. The SSA contends that Edwards thereby waived her right to seek such a remand for consideration of the new Cunningham and Nelson opinions. *See* SSA Response to Objections at 4. The court need not decide whether Edwards waived the remand argument, because it has concluded that she has not even tried to show good cause for failing to introduce this evidence before the ALJ and the evidence likely would not have led to a different outcome.